# CATO v. TEXAS & P. RY. CO.

## No. 1451—5686.

Commission of Appeals of Texas, Section A.

June 10, 1931.

S. P. Jones and Franklin Jones, both of Marshall, and J. A. R. Moseley, Jr., of Texarkana, for plaintiff in error.

King, Mahaffey & Wheeler, of Texarkana, for defendant in error.

SHARP, J.

The Supreme Court granted a writ of error to review the opinion of the Court of Civil Appeals for the Sixth District. Plaintiff recovered judgment against the defendant for damages sustained while boarding a passenger train at its depot in Texarkana, Tex. For the sake of brevity, we refer to the opinion of the Court of Civil Appeals for a more detailed statement of the case. 19 S.W.(2d) 858.

We refer to the parties as they were designated in the trial court.

The Court of Civil Appeals reversed the judgment of the trial court and remanded the case for another trial upon the ground that the issues of negligence submitted to the jury did not warrant the judgment entered. In view of this holding we deem it expedient to set out herein a brief statement of the nature of the pleadings; the material parts of the testimony introduced at the trial, and the material issues submitted to the jury and their answers thereto.

The Court of Civil Appeals briefly states the nature of the pleadings as follows:

"The suit was by appellee for damages for personal injuries received by him while, as he alleged, in the relation of a passenger, through negligence on the part of the railway company in the following respects: (1) In allowing a long passenger train on track No. 1, parallel with and next to the depot, to block the access of awaiting passengers to the passenger train on track No. 3, upon which the plaintiff was to take passage. (2) In failing to provide a free and unobstructed passageway from the depot to the train upon track No. 3, which was stopped there awaiting passengers. (3) In maintaining a square wooden boxlike structure, protruding above the surface of the ground, between the two tracks, the track on which the train was placed and the next track in the direction of the station therefrom; and in maintaining such structure in an ill state of repair. (4) In failing to provide any lighting system whatever for the space between the two tracks where the plaintiff was required to pass to board his train.

."The defendant company specially pleaded, as negligence causing and contributing to cause the injuries, that the plaintiff was familiar with the arrangement and location of the track and the trains; that a considerable and reasonable time before the scheduled time for the departure of the train on track No. 3 the trains then occupying tracks Nos. 1 and 2 had been cut in twain so as to allow free and easy passage from the station over and across tracks 1 and 2 to the passenger train on track 3; that a porter was provided to distinctly announce the impending departure of trains and to give directions about how to cross tracks 1 and 2 in order to reach the train on track 3; that the plaintiff attempted to board the train while in motion."

The material parts of the testimony introduced are stated as follows:

"On December 21, 1927, the date of the injury, the Missouri-Pacific Railway Company, the Kansas City Railway Company, and the appellant company, maintained and respectively were using at Texarkana a union depot for receiving and discharging passengers. The depot building extended east and west. Near the middle part of the building was the ticket office, the waiting room for white passengers, and the one for colored passengers, and closets and lavatories. On the east end of the building were the baggage and express rooms, and on the west end were the railway terminal rooms and those used by the Postal Service of the United States. Along the entire front of the depot was a concrete walk, covered by a shed extending its entire length. Immediately south of and parallel with the concrete platform were located three tracks, called 1, 2 and 3, used for passenger trains. Between tracks 1 and 2, and between tracks 2 and 3, were plank platforms, which were on a level with the rails of the tracks, extending the entire length of the depot. There were lights as far as the platform extended. Beginning at the west end of the platform was the railway yard, used as such. Six and one-half feet west of the west end of the depot platform, and lo-

cated between tracks 2 and 3, is a water box, inclosing a hydrant, used and maintained by the companies in necessary operation of trains. According to the evidence in behalf of the defendant, the water box extended 1¾ inches above the level of the cinders between the tracks. According to the plaintiff, the water box was about 6 inches above the level of the surface.

"On the evening of December 21, 1927, the appellee went to the union depot above described and purchased a ticket to Foulke, Ark., over the T. S. & N. Railway, a line operated by appellant between Texarkana, Tex., and Shreveport, La. The train was regularly run as a mixed train, consisting of one combination coach for baggage, mail, and passengers, and the ordinary freight cars and caboose carried in a freight train. It was invariably placed on track No. 3, with the combination coach nearly opposite the express and baggage rooms on the easterly end of the depot and the board platform above described. The train was so placed in order to receive passengers, mail, and express. According to a schedule of long standing this train was due to leave the depot at 7:30 o'clock p. m. On the evening in question, it actually left the depot at 7:35 o'clock. At the time the appellee purchased the ticket, there was standing on track No. 2 a passenger train of the Texas Central Railway, operated by appellant, and on track No. 1 a passenger train of the Kansas City Southern Railway Company. The Texas Central passenger train arrived on schedule time at 6:35 o'clock p. m., and discharged all passengers; Texarkana being the end of the run. The rear couch of that train rested in close proximity to the water box above described, and the engine rested east thereof and about a car length, or 60 feet, west of the west end of the baggage room. Passengers were discharged at this point on this occasion, but that was not done there before. The Kansas City Southern passenger train was scheduled to arrive at the depot at 6:20 o'clock p. m., and was due to depart therefrom at 6:50 p. m. On the particular evening of December 21 that train was about 35 minutes late, arriving at 6:55 p. m., and departing at 7:50 o'clock or later. The train consisted of an engine and six cars. According to appellee's testimony, however, the train 'was long, of seven or eight cars and an engine.' The engine of the train, headed east, rested nearly to and opposite the baggage room and approximately 150 feet east of the door of the waiting room for white passengers in the depot. The train, standing connected up, would entirely block the way to passengers seeking to embark on the train on track No. 3. When disconnected or cut in twain at a point opposite or nearly opposite to the baggage room of the depot, an open clear way would be afforded passengers or persons to go from the waiting room and concrete platform to the plank platform and passenger coach of the train on track No. 3."

Again it is said: "There is affirmative evidence in behalf of appellant that about 7:15 o'clock p. m. the Kansas City Southern train occupying track No. 3 (1) was cut in twain at a point opposite the baggage room, and which was 'about two car-lengths above (east of) the waiting-room door.' The train was separated 'something like twenty or thirty feet,' and 'stayed unconnected about twenty or twenty-five minutes' and until after the T. S. & N. train on track No. 3 had departed. The mail foreman testified: 'I told Mr. Killway, the acting terminal train master, that we had to get this train (K. C. S.) cut in two so we could get to the mail-cars there (on track 3), and he said all right. He told the conductor, and he cut the train between the baggage and mail-car. The cut was made about two car-lengths above the waiting-room door. After the cut was made we pulled the mail across over to the T. S. & N., and loaded it right straight on in there. We had forty or fifty sacks of mail put over there and loaded on that train. * * * The railway company did not cut this train until I requested it to be cut, and the reason it happened to be cut that night was the fact that I requested it to be cut.'"

Again it is said:

"The appellee testified: 'I walked right straight out of the station and within six or eight feet of the train that was on the track (No. 1). I then looked both east and west. As it happened then, as I looked at the train, I did not see any opening in the train at all. As I looked at it to the east and looked at it to the west it appeared to be longer to the east, and then I decided to go around the west of the train.' He further testified: 'I looked up both ways. I could see clear up, but could not see the engine. It was dark. I could not see beyond the express office on account of the trucks there. I knew those trucks did not go up as high as the passenger-coach. * * * There was no cut up there just beyond the depot, in that K. C. S. train. There was no cut there at all when I went out and looked, and that was about 7:30.'

"It was shown that three mail trucks were parked within 14 or 16 inches of the body of the end car, which was disconnected from the train on track No. 1 for the purpose of loading mail. It also appears that there were other trucks loaded with mail parked next to the waiting room for colored people. It was shown by appellant that an employee was kept in the waiting rooms to call the departure of trains, and that on this occasion departure of the train on track No. 3 was called at the proper time. It was further shown that this employee showed several pas-

sengers how to get through the cut on the train. The appellee did not testify that he made inquiry from this or any other employee as to how to reach the coach on track No. 3."

The material special issues submitted to the jury and the answers thereto are copied below:

"Question Number One: Did the plaintiff exercise ordinary care in selecting and traveling the route he took in going to the train?" To which the jury answered, "Yes."

"Question Number Three: Did the water box extend above the ground?" To which the jury answered, "Yes."

"Question Number Four: If you have answered Question No. Three yes, answer this question: Was the defendant guilty of negligence in permitting or having the water box to extend above the ground?" To which the jury answered, "Yes."

"Question Number Five: If you have answered Question No. Four yes, answer this question: Did the plaintiff strike his foot against the water box?" To which the jury answered, "Yes."

"Question Number Six: If you have answered Question No. Five yes, answer this question: Was plaintiff caused to fall and be injured by striking his foot against the water box?" To which the jury answered, "Yes."

"Question Number Seven: If you have answered Question No. Six yes, answer this question: Was the negligence, if any you found in answer to Question No. Four, a proximate cause of said injury?" To which the jury answered, "Yes."

"Question Number Eight: Do you find from the evidence that the defendant failed to have the way pursued by plaintiff in going to the train lighted?" To which the jury answered, "Yes."

"Question Number Nine: If you have answered Question No. Eight yes, answer this question: Was such failure, if any you find, negligence on the part of the defendant, as that term has been defined to you?" To which the jury answered, "Yes."

"Question Number Ten: If you have answered Question Number Nine yes, answer this question: Was such negligence a proximate cause of plaintiff being injured?" To which the jury answered, "Yes."

"Question Number Eleven: Did the plaintiff exercise ordinary care in selecting and walking along the route he pursued in traveling between the tracks two and three toward the coach of the train on track three?" To which the jury answered, "Yes."

"Question Number Thirteen: Did the plaintiff, after the defendant's train he desired to board, was put in motion, and at a place which had not been set apart by defendant for the reception of passengers and in the darkness, and while said train was in motion, undertake to board said train?" To which the jury answered, "No."

"Question Number Sixteen: Was the plaintiff guilty of negligence in failing to reach and board the coach before the train started?" To which the jury answered, "No."

"Question Number Eighteen: Was the space between the tracks Numbers Two and Three at and about the point where the plaintiff was injured sufficient for plaintiff to walk therein in safety from the moving train on Track No. Three, although both tracks at the time were occupied by trains, and although while so walking he might have stumbled and fallen forward?" To which the jury answered, "No."

"Question Number Nineteen: Did the plaintiff, while between Tracks Numbers Two and Three, and after the defendant's mixed train on Track No. Three had been put in motion, without necessity for so doing, and in the darkness, undertake to walk between such tracks and in such close proximity to the moving mixed train as to be in danger if while walking he might stumble and fall forward?" To which the jury answered, "No."

"Question Number Twenty-Two: Did the plaintiff, after purchasing his ticket, have time, by the exercise of ordinary care and diligence on his part, considering the route actually taken by him, to reach the defendant's train on which he desired to take passage, and go aboard said train in safety before it was put in motion?" To which the jury answered, "No."

"Question Number Twenty-Five: Did the plaintiff actually reach Track No. Three on which defendant's mixed train was located for the reception of passengers, in time, by the exercise of ordinary care and diligence, to board said train in safety, before it was put in motion?" To which the jury answered, "No."

The rule is well settled in this state that a railroad company which has provided a safe means of entrance and exit from its cars, while at the same time there exists another way which is not safe and which is in such general use by its passengers as to induce the belief that it was provided, in part at least, for that purpose, is liable for injury received by a passenger using such unsafe entrance and exit without warning from the company's servants.

In the case of Stewart v. I. & G. N. R. R. Co., 53 Tex. 289, 37 Am. Rep. 753, the Supreme Court announced the following well-settled rule: "It is the duty of railway companies to provide reasonable accommodations at their stations for passengers who have occasion to travel on their roads. They are

under obligation 'to keep in a safe condition all portions of their platforms and approaches thereto, to which the public do or would naturally resort, as well as all portions of their station grounds, reasonably near to the platforms, where passengers, or those who have purchased tickets with a view to take passage on their cars, would naturally or ordinarily be likely to go.' "

The case of Missouri Pacific Railway Co. v. Long, 81 Tex. 253, 16 S. W. 1016, 1017, 26 Am. St. Rep. 811, involved the duty of a railroad company to furnish its passengers a safe exit from its cars, and Chief Justice Gaines, in rendering the opinion, says: "The evidence showed there was a safe way provided by the company, by taking which the accident might have been avoided. But such was not the basis of the action. The plaintiff did not seek to recover because there was not a safe way, but upon the ground that there was another way, which, under the circumstances, was not safe, and which, by reason of the conduct of the servants of the company in permitting its general use by passengers, he was led to believe was provided for their use." Quoting further from the same opinion, it says: "But it does not follow that, because a safe way is provided, a passenger is bound at his peril to ascertain the fact, and to avail himself of that way, when he sees that another way, apparently safe, is in general use by the passengers with the tacit permission of the servants of the company. Such use and such permission are calculated to induce the belief that the way is provided, in part at least, for the egress of passengers, and that a passenger is expected to make use of it, should he elect to do so. Under such circumstances a man of ordinary prudence might avail himself of such a plan of exit, and therefore it cannot be declared as a matter of law that it is negligent to do so. The question would be for the jury. On the other hand, can it be announced as a legal conclusion that a railroad company has discharged its whole duty to the passengers when it has provided a safe exit from its cars, while at the same time there exists another way, which is not safe, and which is in such a general use by its passengers as to induce the belief that it was provided, in part at least, for that purpose? We think not."

The case of M., K. & T. Ry. Co. v. Criswell, 101 Tex. 399, 108 S. W. 806, 808, involved the question of liability on the part of the railroad company to one of its passengers for injuries sustained after alighting from a train at a station by slipping down on an incline on a platform leading to the waiting room because of the failure of the railroad to use ordinary care to keep it in safe condition for the use of passengers or to warn them that it was not a proper way for them to take in going to and from the train, though another and safe way to the waiting room had been provided by the company, where the platform on which the injury occurred was usually used by passengers going to and from the train and where such use had been continued for such a length of time that the railroad company necessarily knew of the use, and Judge Brown, in delivering the opinion for the Supreme Court, says: "The company having established and provided the one walkway for the use of the passengers between its waiting room and the place at which it received and discharged passengers from its trains, and there being another walkway between the same points not intended for the use of passengers, but which for a number of years passengers had usually and ordinarily used for that purpose, the railroad company was bound to take notice of such use, and, in the absence of any notice or warning against using this way by passengers, Mrs. Criswell had the right to assume that the way used by passengers was provided for their use and was in proper condition. The undisputed evidence shows such use of the walk on which the injury occurred as imposed upon the railroad company the duty to use ordinary care to keep it in safe condition for the use of its passengers, and if Mrs. Criswell's injury resulted from a failure to perform that duty the railroad company must be held liable to the same extent as if the injury had occurred upon the platform provided by it for the use of passengers. Hutchinson on Carriers, § 937; 3 Thompson on Neg. § 2691; Cazneau v. F. R. Co., 161 Mass. 355 [37 N. E. 811]; Collins v. Railway Co., 80 Mich. 390, 45 N. W. 178; Lemon v. G. R. & I. Ry. Co., 136 Mich. 647, 100 N. W. 22; G. C. & S. F. Ry. Co. v. Glenk, 9 Tex. Civ. App. 599, 30 S. W. 278; G. C. & S. F. Ry. Co. v. Hodges (Tex. Civ. App.) 24 S. W. 563; Beard v. Conn. & P. R. Co., 48 Vt. 101."

For a list of the authorities cited in support of the foregoing propositions, see Tex. Jur. vol. 9, pp. 747, 748, 749, 750, 751, 752, 753, 754, etc.

Plaintiff based his suit for recovery upon several grounds of negligence. In addition to the ground that defendant failed to provide a free and unobstructed passage way from the depot to the train upon track No. 3, which was stopped there awaiting passengers, he further alleged that defendant failed to provide any lighting system whatever for the space between the two tracks where the plaintiff was required to pass to board his train; that the space between the tracks at the point where plaintiff was injured was unsafe; and also in maintaining a square wooden box like structure protruding above the surface of the ground between the two tracks and in maintaining such structure in a bad state of repair.

The case was submitted to the jury upon twenty-eight special issues, and the answers made thereto establish negligence on the part of defendant on two or more grounds, viz.:

(a) That the defendant was guilty of negligence in permitting and having the water box to extend above the ground.

(b) That the defendant failed to have the way pursued by plaintiff in going to the train lighted.

(c) That the space between the tracks at the point where plaintiff was injured was insufficient for plaintiff to walk therein in safety from the moving train on track No. 3.

The findings of the jury also established the fact that each of the first two acts of negligence of the defendant, above stated, was a proximate cause of the injury sustained by the plaintiff, and the jury answered all issues bearing upon the negligence of plaintiff in his favor.

■■ Independent of the question as to the issue of negligence in failing to provide a free and unobstructed passageway being raised, and not requested to be submitted to the jury, this record would not authorize a reversal of the judgment entered by the trial court. There were two or more grounds of negligence relied upon by plaintiff and submitted to the jury and the jury made favorable findings in answer thereto. The pleadings and proof sufficiently raised these issues of fact to be determined by the jury, and the testimony tends to sustain the findings made by the jury. Since the judgment finds support in one or more grounds of negligence, the failure to submit another ground of negligence was harmless and immaterial. West Texas Coaches v. Madi (Tex. Com. App.) 26 S.W.(2d) 199; Thornton v. Moody (Tex. Civ. App.) 24 S. W. 331; (error refused); Northwestern Nat. Life Ins. Co. v. Blasingame et al., 38 Tex. Civ. App. 402, 85 S. W. 819 (error refused); Ward et ux. v. Cathey (Tex. Civ. App.) 210 S. W. 289 (error refused); Yoes v. T. & P. Ry. Co. (Tex. Civ. App.) 211 S. W. 311; Eastern Texas Elec. Co. v. Hunsucker (Tex. Civ. App.) 230 S. W. 817, 819.

We think, in view of this record and the foregoing authorities, that the Court of Civil Appeals erred in reversing the judgment of the trial court and remanding same for another trial.

Therefore, for the reasons herein stated, we recommend that the judgment of the Court of Civil Appeals be reversed, and the judgment of the trial court be affirmed.

CURETON, C. J.

Judgment of the Court of Civil Appeals is reversed, and that of the district court is affirmed, as recommended by the Commission of Appeals.